IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CHRISTINE ONDERSMA,<br><br>    Plaintiff,<br><br>  v.<br><br>METROPOLITAN LIFE INSURANCE COMPANY, et al.,<br><br>    Defendants.<br>_____ / | Case No. C-06-0258 MMC<br><br>**ORDER DENYING MOTIONS FOR SUMMARY JUDGMENT; FINDING PLAINTIFF ENTITLED TO JUDGMENT; FINDINGS OF FACT AND CONCLUSIONS OF LAW; DIRECTIONS TO PARTIES** |

    Before the Court is plaintiff Christine Ondersma's motion for summary judgment, filed February 9, 2007, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants Metropolitan Life Insurance Company ("MetLife") and Wells Fargo & Company Long Term Disability Plan ("LTD Plan") have filed opposition, to which plaintiff has replied. Also before the Court is defendants' motion for summary judgment, filed February 9, 2007, to which plaintiff has filed opposition; defendants have replied. Having considered the parties' submissions in support of and in opposition to the motions, the Court finds the matter appropriate for decision without oral argument, see Civil L. R. 7-1(b), and rules as follows.

//

**BACKGROUND**

Plaintiff was formerly employed as a Project Manager with Wells Fargo and Company. (Administrative Record ("AR") 932.)[1]

On August 24, 2001, plaintiff submitted a claim for short-term disability benefits under the Wells Fargo & Company Short-Term Disability Plan ("STD Plan"); in her claim, plaintiff stated she became "disabled" as of August 18, 2001. (AR 1452.) MetLife approved the claim, initially through September 9, 2001, (id.), and then through November 19, 2001, (AR 1438). On February 5, 2002, MetLife advised plaintiff it would not pay short-term disability benefits beyond November 19, 2001, on the ground "there [were] no current medical supporting impairments to extend [plaintiff's] benefits." (AR 1415.) After further administrative proceedings, MetLife, on December 11, 2002, adhered to its decision that plaintiff was not entitled to short-term disability benefits beyond November 19, 2001. (AR 1212-16.)

Thereafter, by notice dated June 28, 2003, the Social Security Administration ("SSA") found plaintiff was disabled, for purposes of the Social Security Act, as of October 1, 2001. (AR 668-71.)

On December 14, 2004, plaintiff submitted a claim for long-term disability benefits under the LTD Plan, stating therein she became disabled as of August 18, 2001. (AR 656-71.) On March 29, 2005, MetLife denied plaintiff's claim for long-term benefits, stating "medical documentation does not support an impairment or limitations that would preclude [plaintiff] from performing her own occupational duties as a Project Manager on a full time basis prior to May 4, 2002." (AR 648.)[2] On September 15, 2005, MetLife denied plaintiff's appeal of the March 29, 2005 denial, stating "documentation does not support restrictions and limitations that would preclude [plaintiff] from performing her own occupational duties

---

[1]The Administrative Record was lodged by defendants on February 9, 2007.

[2]On May 4, 2002, plaintiff incurred a "left wrist fracture, which required external fixator repair." (Id.) Plaintiff does not argue she is entitled to benefits based on the fracture.

as Project Manager." (AR 628.) On November 9, 2005, MetLife denied a second appeal by plaintiff, stating "documentation submitted for claim review has failed to provide medical evidence of a physical or global impairment that would preclude [plaintiff] from gainful employment in her own occupation for any employer in her local area." (AR 713.)

On January 13, 2006, plaintiff filed the instant action for long-term disability benefits ("LTD benefits").[3]

By order filed November 16, 2006, the Court determined it would review de novo the denial of plaintiff's claim for LTD benefits.

## DISCUSSION

**A. Summary Judgment Motions**

All parties assert they are entitled to summary judgment. Where, as here, the district court reviews de novo the denial of a claim for benefits, a motion for summary judgment may be granted only where there is no genuine issue of fact as to whether the claimant is disabled under the meaning of the subject policy. See Kearney v. Standard Ins. Co., 175 F.3d 1084, 1093 (9th Cir. 1999).

Under the terms of the subject policy, MetLife is required to pay disability benefits if a participant is disabled or becomes disabled while the participant is covered under the LTD Plan. (AR 197.) The policy defines "disabled" as follows:

> "Disabled" or "disability" means that, due to sickness (including a mental or nervous condition), pregnancy or accidental injury, you are receiving appropriate care and treatment from a doctor on a continuing basis; and
>
> • During your LTD waiting period and the next 24-month period, you are unable to earn 80% or more of your predisability covered pay or indexed covered pay at your own occupation for any employer in your local economy; or

//
//

---

[3] In addition to naming MetLife and the LTD Plan as defendants, plaintiff named the STD Plan as a defendant. By order filed June 14, 2006, the Court, upon stipulation of the parties, dismissed plaintiff's claim against the STD Plan. Accordingly, the Court does not consider whether plaintiff is or was entitled to short-term disability benefits.

> • After this 24-month period, you are unable to earn more than 60% of your index covered pay from any employer in your local economy at any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and predisability covered pay.

(<u>Id.</u>)[4]

As noted, plaintiff alleges she is disabled, and that she became disabled as of August 18, 2001. The administrative record contains evidence that, if credited, would support a finding plaintiff has been disabled as of August 18, 2001. (<u>See</u>, <u>e.g.</u>, AR 1078-80) (plaintiff's treating physician opining that plaintiff "has been unable to perform her duties since the onset of fibromyalgia in August 2001" and is "incapable of regular, gainful employment on a sustained basis"). Likewise, the administrative record contains evidence that, if credited, would support a finding plaintiff was not disabled as of August 18, 2001. (<u>See</u>, <u>e.g.</u>, AR 1249-53) (reviewing physician opining he "did not find objective medical evidence, pathology, or functional limitations or intensity of treatment which suggests a severity from fibromyalgia that would preclude gainful employment").

Accordingly, no party is entitled to summary judgment, and the Court must "try the case on the record that the administrator had before it," and make findings of fact and conclusions of law regarding plaintiff's entitlement to LTD disability benefits. <u>See</u> <u>Kearney</u>, 175 F. 3d at 1095.[5]

**B. Findings of Fact and Conclusions of Law Re: LTD Benefits**

In their respective motions, the parties address the weight, or asserted lack thereof, of the evidence on which the opposing side relies. Consequently, the Court at this time proceeds to make the requisite findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

Initially, the Court finds, as defendants acknowledge, that the symptoms for

---

[4] The "LTD waiting period" is "a 22-week period of continuous disability, beginning on [the] initial date of disability." (AR 196.)

[5] Although a district court may, under some circumstances, consider evidence outside the administrative record, <u>see</u> <u>id.</u> at 1090, neither party has requested the Court consider any such extrinsic evidence in the instant case.

4

fibromyalgia are "entirely subjective." See Jordan v. Northrop Grumman Corp., 370 F. 3d 869, 872 (9th Cir. 2003). As the Ninth Circuit has held:

> [Fibromyalgia], formerly called fibrositis, has traditionally been used for an ill-defined, poorly understood set of symptoms, consisting of aching pain and stiffness in one or several parts of the body. As we have previously explained, fibromyalgia's cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. The consensus construct of fibromyalgia identifies the syndrome as associated with generalized pain and multiple painful regions. Sleep disturbance, fatigue, and stiffness are the central symptoms, though not all are present in all patients. The only symptom that discriminates between it and other syndromes and diseases is multiple tender spots, which we have said were eighteen fixed locations on the body that when pressed firmly cause the patient to flinch. The diagnosis is now based on patient reports of a history of pain in five parts of the body, and patient reports of pain when at least 11 of 18 points cause pain when palpated by the examiner's thumb. Although the Mayo Clinic states that the syndrome is neither "progressive" nor "crippling," the symptoms can be worse at some times than others. Objective tests are administered to rule out other diseases, but do not establish the presence or absence of fibromyalgia.
>
> Objective physical signs, laboratory results, and x-ray results are generally negative, and because the majority of patients appear tense and anxious and have no recognizable objective basis for symptoms, the syndrome is often considered psychogenic. This Court, however, has recognized fibromyalgia as a physical rather than a mental disease. . . .  More recently, the American College of Rheumatology has issued a set of agreed-upon diagnostic criteria. According to the College, the symptoms of fibromyalgia are potentially "soft" and may be subject to examiner interpretation.

Id. (internal quotations, alternations, and citations omitted).

In a statement plaintiff originally submitted to the SSA and also submitted to MetLife, plaintiff reports that she suffers from leg pain, sleep deprivation, back and shoulder pain, neck spasms, frequent urination, hand and wrist achiness, restless leg syndrome, irritable bowels, an inability to sit, stand, or type for extended periods of time, concentration difficulties, memory loss, and fatigue. (AR 1292-93.) Plaintiff also indicates therein that, as a result of her symptoms, she "can no longer do or has difficulty doing" many daily activities, including driving, cleaning house, ironing, sewing, painting, attending church, shopping, caring for grandchildren, laundry, gardening, finances, volunteer work, vacationing, reading, yoga, watching television and listening to the radio, cooking, walking,

standing, sitting, writing, speaking, engaging in social functions, interacting with her family, caring for herself, keeping commitments, and using the telephone. (AR 1294-96.)[6]

The record also includes an opinion by plaintiff's treating physician, Susan Rapp, M.D. ("Dr. Rapp").[7] Specifically, Dr. Rapp, on a form provided by MetLife and dated February 20, 2002, opines that plaintiff has been diagnosed with fibromyalgia as of August 2001, sets forth the basis for such diagnosis, and offers the opinion that plaintiff, as a result of her symptoms, is precluded from performing her job. (AR 1339-41.) The symptoms identified by Dr. Rapp are "persistent or relapsing fatigue," "impaired memory or concentration," "muscle pain," "new headaches," "nonrestorative sleep," "post-exertional malaise for > 24 hours," "problems w/memory & concentration, "sleep disturbance," and "restless leg syndrome." (AR 1339.)

The record also includes opinions offered by another of plaintiff's treating physicians, Dr. Rajiv K. Dixit, M.D., F.A.C.P. ("Dr. Dixit"), an internist and rheumatologist, who states he has "many patients with fibromyalgia" and is "very familiar with the pathology of the disease." (AR 1079, 1258.) In a report dated May 2003, Dr. Dixit opines that "[plaintiff] has been unable to perform her duties since the onset of fibromyalgia in August 2001." (AR 1080.) In particular, Dr. Dixit opines therein that plaintiff can no longer perform the "problem solving/analytic, planning, teamwork and communication skills" required of a Project Manager, because plaintiff does not have the required "stamina or energy" and is "unable to concentrate," to "cope with the stress associated with the demands of her role," and to "communicate articulately." (Id.) Additionally, Dr. Dixit identifies the following general work restrictions:

> [Plaintiff] can occasionally lift and/or carry five pounds. She cannot do any frequent lifting. She cannot stand or walk for more than an hour at a time.

---

[6] In his answers to a questionnaire provided to him by the SSA, and which plaintiff subsequently submitted to MetLife, plaintiff's husband has made similar statements, confirming plaintiff's subjective symptoms and their impact on her ability to function. (AR 1284-89; see, e.g., AR 1289 ("My wife is so sleep-deprived and in such pain that it affects every facet of her (our) life.").)

[7] Dr. Rapp's speciality is "family practice." (AR 1341.)

> She cannot sit for more than 2 hours and even then she needs frequent breaks. She has difficulty viewing her computer monitor. Her use of a keyboard or mouse is limited by her upper extremity pain. She should avoid exposure to extreme cold or heat as these conditions exacerbate the symptoms of fibromyalgia.

(Id.) In light of such restrictions, as well as his opinion that plaintiff cannot perform the tasks required of a Project Manager, Dr. Dixit opines that plaintiff is "incapable of regular, gainful employment on a sustained basis." (Id.)

In explaining the basis for his opinions, Dr. Dixit relies on the results of his examinations that show plaintiff to have "widespread bilateral tender points consistent with fibromyalgia," "severe tenderness of the right paracervical" area of her neck, limited "range of motion" with respect to "right lateral rotation" of her neck, "stiffness in gait," and "bilateral limited range of motion in [her] hands, writs, arms, shoulders, and neck." (Id.) Additionally, Dr. Dixit relies on his observations of plaintiff's "stammering and using wrong words," "irritability," and having "poor concentration during conversation." (Id.) Further, Dr. Dixit relies on plaintiff's subjective reports, such as "profound sleep disturbance," "morning fog and stiffness," the "inability to make commitments due to unpredictability of pain and energy level," and "clumsiness." (AR 1078.)

On a form provided to him by MetLife, and dated December 20, 2004, Dr. Dixit opines that because of "widespread pain" and "fatigue," plaintiff cannot work, and, specifically, plaintiff (1) can only sit for one hour "intermittently," as opposed to "continuously," (2) can only stand for one hour "intermittently," (3) can only walk for one hour "intermittently," (4) cannot lift up to ten pounds, and (5) cannot perform any "repetitive" finger or eye/hand movements. (AR 1074.) In a subsequent letter to MetLife, dated September 26, 2005, Dr. Dixit again offers the opinion that plaintiff's fibromyalgia symptoms prohibit her from being "gainfully employed," (AR 744); in such letter, Dr. Dixit refers to plaintiff's experiencing symptoms such as "deep muscular aching, throbbing, twitching, and shooting pain throughout the body," "impaired memory and concentration," "increasing cognitive decline," "unpredictable stamina," "impaired coordination," and "disorientation." (AR 744.)

As stated above, plaintiff's evidence, if found to be credible, is sufficient to support a finding that plaintiff is disabled within the meaning of the LTD Plan. Defendants articulate no basis for a finding that plaintiff is not credible, and no basis for such a finding is apparent from the evidence in the record.[8] Defendants do, however, characterize plaintiff's showing as "slight" and "questionable." (See Defs.' Opp. to Pl.'s Mot. for Summ. J. at 3:26-27.) In support of this argument, defendants rely on Jordan, 370 F. 3d 869, in which the Ninth Circuit affirmed a district court's decision that an ERISA plan administrator had not abused its discretion in finding a claimant with fibromyalgia had failed to show she was unable to perform her job as a secretary as a result of her symptoms.

In Jordan, the claimant supported her claim of disability with the opinion of a treating physician, who stated in a "conclusory" manner that the claimant could not "function [in] even sedentary work at present because of flare up of her fibromyalgia and intensity of pains," and the opinion of a second treating physician who, in a "terse letter," stated that "under her current state of affairs, [the plaintiff] is medically disabled from her job as a secretary." See Jordan, 370 F. 3d at 873-74, 882. The claimant's medical "chart" in Jordan included observations by "her physician" that the claimant was "in no acute distress," was "freely ambulatory," and had "no proximal muscle weakness." See id. at 880.[9] Moreover, the claimant admitted she remained able to engage in such activities as "laundry, vacuuming, dusting, mopping, washing dishes, cooking, and shopping for groceries." See id. Not surprisingly, the Ninth Circuit characterized the plaintiff's evidence of disability as "slight" and stated the reliability of such slight evidence was "questionable," see id. at 882.

---

[8]In a footnote, defendants cite a case in which the Court of Appeals observed that an insurer "must consider the possibility that applicants are exaggerating in an effort to win benefits." See Leipzig v. AIG Life Ins., 362 F. 3d 406, 409 (7th Cir. 2004). Defendants do not expressly argue, however, that plaintiff is exaggerating or otherwise uncredible, and, more importantly, point to nothing in the record that would support such a finding. Cf. Jordan, 370 F. 3d at 880 (affirming finding plaintiff not disabled by fibromyalgia, where, in spite of claim of disability, plaintiff admitted she was able to engage in certain daily activities that "cut against a determination of severe pain").

[9]The author of this chart entry is not further specified in the opinion.

8

Here, by contrast, the opinion offered by Dr. Dixit is not conclusory in nature. The basis for his opinion is disclosed. Specifically, he details particular symptoms from which plaintiff suffers, including symptoms he directly observed or found to exist as a result of his examinations; further, he identifies functional limitations typically resulting from such specified symptoms and explains why plaintiff's symptoms, in particular, would cause her to be so limited.[10] Additionally, unlike the record presented in Jordan, there is nothing in the record herein to indicate Dr. Dixit's opinion is contradicted by other information in the medical records. Moreover, to the extent Dr. Dixit's opinion is based on symptoms he did not personally observe, there is no basis upon which to disregard such opinion, because, as noted, there is no basis upon which to find plaintiff is not credible.

The opinion of a treating physician "gets no special weight," however, and "can be rejected on the basis of reliable evidence." See id. at 879. Consequently, the Court turns to defendants' next argument, specifically, that opinions offered by six physicians who, at defendants' request, reviewed the administrative record and offered the opinion that plaintiff is not disabled, are entitled to more weight than those offered by plaintiff's treating physicians.

Two of the six opinions on which defendants rely were submitted in 2002:[11]  (1) in a report dated November 25, 2002, psychiatrist Lee H. Becker, M.D. ("Dr. Becker"), opines that "[t]he psychiatric documentation available does not support such significant global psychiatric impairments to preclude return to work at [plaintiff's] own occupation from 11/19/02 forward," (AR 1248); and (2) in a report dated November 26, 2002, R. Kevin Smith, D. O. ("Dr. Smith"),[12] opines that plaintiff, as a result of her fibromyalgia, "would

---

[10]The opinion offered by Dr. Rapp is significantly less detailed than that of Dr. Dixit. Given that Dr. Rapp's opinion is set forth on a form provided by MetLife, however, the absence of greater detail appears to be, at least in part, attributable to the limited nature of the questions posed therein by MetLife.

[11]The 2002 opinions were offered with respect to plaintiff's claim for short-term benefits.

[12]Dr. Smith is a Doctor of Osteopathic Medicine who specializes in "preventive medicine" and "occupational medicine." (AR 1253.)

9

1 need to work in a less stressful and not mentally taxing environment," but that the "medical
2 records" do not support a finding that she is unable to work because "[s]ubjective
3 complaints of pain should not be considered evidence of inability to work or impairment"
4 and because plaintiff has not undergone "a level of treatment consistent with disabling
5 fibromyalgia," such as "cognitive or behavioral therapy" or hospitalization, (AR 1252-53).
6 As set forth below, the Court finds neither opinion persuasive.

7    Dr. Becket's opinion that plaintiff is not disabled as a result of a "psychiatric"
8 condition is of little, if any, relevance to the issue of whether plaintiff is disabled by
9 fibromyalgia, which is a "physical rather than mental disease." See Jordan, 370 F. 3d at
10 873. Dr. Smith's opinion, likewise, is entitled to little weight, as it was rendered before the
11 administrative file contained either the above-referenced opinion by Dr. Dixit or the
12 numerous references to the various types of treatment plaintiff had tried without success.
13 (See, e.g., AR 1079 (May 2003 report identifying nine medications plaintiff had tried,
14 without success, to alleviate symptoms, as well as multiple unsuccessful treatments,
15 including "acupuncture," "neck traction," "chiropractic treatment," "chronic pain clinic," and
16 "mediation and relaxation").)[13] Further, as noted, Dr. Smith's opinion is based on his
17 assertion that "[s]ubjective complaints of pain should not be considered evidence of inability
18 to work or impairment." (AR 1252.) As discussed above, however, the symptoms of
19 fibromyalgia are "entirely subjective," see Jordan, 370 F. 3d at 873, and, contrary to Dr.
20 Smith's implicit assertion, relevant authority exists to support a finding that subjective pain
21 associated with fibromyalgia can constitute a disabling condition, see, e.g., Benecke v.
22 Barnhart, 379 F. 3d 587, 596 (9th Cir. 2004) (holding claimant with fibromyalgia entitled to
23 disability benefits where "the evidence establishes that [the claimant] would be unable to
24 maintain employment while managing her pain and fatigue"); Walker v. American Home
25 Shield Long Term Disability Plan, 180 F. 3d 1065, 1071 (9th Cir. 1999) (holding triable
26 issue of fact existed as to whether plaintiff's fibromyalgia symptoms were disabling).

---

[13]Dr. Becket's opinion is entitled to little weight for this reason as well.

10

Finally, Dr. Smith's opinion that subjective complaints of pain cannot, as a general matter, evidence impairment in work abilities would appear to be contradicted by his own opinion that plaintiff, because of her fibromyalgia symptoms, should work in a "less stressful and not mentally taxing environment." (AR 1252.)[14]

The remaining four opinions on which defendants rely were prepared in 2005. The first of these opinions was rendered on August 1, 2005 by Elinor Mody, M.D. ("Dr. Mody"), a rheumatologist. Dr. Mody opines that "[t]here is no evidence to support any level of decreased functionality for [plaintiff]." (AR 763.) Dr. Mody offers no explanation for such opinion, however. Her opinion, other than her conclusion, consists solely of her description of portions of plaintiff's medical records, and fails to identify any record that would support a finding that plaintiff has no limitations of any nature. Moreover, Dr. Mody's understanding of the record is subject to question; she states there is nothing in the record to indicate Dr. Dixit performed a "physical examination" of plaintiff, (AR 762), whereas the record is replete with references to examinations of plaintiff conducted by Dr. Dixit, (see, e.g., AR 1079 (identifying observations made by Dr. Dixit during "examination"); AR 1073 (stating Dr. Dixit had treated plaintiff beginning in February 2002 and had last given her "treatment" on December 7, 2004); AR 1256-57 (stating Dr. Dixit performed "physical examination" of plaintiff on February 26, 2002; stating results thereof and of later examination).) Irrespective of whether Dr. Mody misinterpreted the record or simply was not given the entire record, such failure to acknowledge relevant information in the record, coupled with her failure to set forth a basis for her conclusion that plaintiff has no restrictions, leads the Court to conclude Dr. Mody's opinion merits little to no weight.

The remaining three of the 2005 opinions were each rendered on October 27, 2005 by, respectively, (1) Reginald A. Givens, M.D. ("Dr. Givens"), a psychiatrist, (2) F. X.

---

[14] Indeed, such portion of Dr. Smith's opinion supports plaintiff's claim for LTD benefits, at least for the first 24 months, (AR 197), given defendants' failure to explain any basis for a finding that the position of Project Manager for Wells Fargo is a position that is not stressful or mentally taxing, and another of the reviewing physicians on which defendants rely stated her understanding that "stressful situations were necessary to perform the job" of Project Manager. (AR 733.)

11

Plunkett, M.D. ("Dr. Plunkett"), an orthopedic surgeon, and (3) Tanya C. Lumpkins, M.D. ("Dr. Lumpkins"), a rheumatologist.

Dr. Givens opines that "[t]he medical evidence does not support a psychiatric impairment from 1/17/02-01/18/04," and that "there is insufficient objective evidence of cognitive dysfunction that would prevent [plaintiff] from performing occupational duties." (AR 721.) Although such opinion may well be accurate, it is, as was the 2002 opinion of Dr. Becket, of little, if any, relevance to the issue of whether plaintiff is disabled by fibromyalgia, which, as noted, is a "physical rather than mental disease." See Jordan, 370 F. 3d at 873.

Dr. Plunkett opines that "there is no evidence of any limitation of [plaintiff's] functional ability at this point [October 27, 2005] and nothing to support functional limitations or an inability to perform all of her normal activities at work." (AR 728.) As discussed above, however, the administrative record includes evidence to support a finding of such limitations, specifically, statements by plaintiff, by her husband, and by her treating physicians, as well as Dr. Smith's opinion that plaintiff should not perform certain types of work. To the extent Dr. Plunkett was not provided with such material, his opinion is entitled to no weight. If, however, Dr. Plunkett was provided with such material, his opinion can only be interpreted as rejecting as uncredible all such evidence, in which case, his opinion is entitled to little to no weight, as Dr. Plunkett sets forth no basis for such rejection.

Lastly, Dr. Lumpkins opines that plaintiff is able to engage in various activities, such as sitting for six hours a day, standing or walking for two hours a day, performing repetitive tasks with her arms and hands, and performing "at least sedentary work." (AR 734.) Although Dr. Lumpkins acknowledges that Dr. Dixit set forth more restrictive limitations, she does not specify the basis for her disagreement with Dr. Dixit in that regard, nor does she identify any medical report or other document, and no such report or document is evident, indicating plaintiff can perform in the manner she predicts, such as, for example, sitting for six hours. To the extent Dr. Lumpkins's opinion sets forth any reasoning for her proposed limitations, she relies on the administrative record's lack of "objective"

12

documentation to support more substantial limitations. (AR 734 (stating "there is no documentation objectively that she would be impaired from performing the routine duties with the upper extremities associated with a sedentary position"); id. (referring to lack of "objective studies supporting the need to restrict physical function as it relates to a sedentary position").) If by "objective," Dr. Lumpkins is suggesting that the documentation of plaintiff's symptoms and their effect on her abilities consists of medically-uncorroborated complaints, Dr. Lumpkins is incorrect. Dr. Dixit, in setting forth his opinion as to the extent of plaintiff's limitations, identified the results of examinations he performed and the observations he made; further, as discussed above, defendants have not identified any basis for a finding that plaintiff is not credible, and no such basis is evident from the record.[15] Under such circumstances, the Court finds Dr. Dixit's opinion is entitled to greater weight than that of Dr. Lumpkins.

Finally, as noted, Dr. Dixit, plaintiff's treating physician, has experience treating patients with fibromyalgia, whereas the record is silent as to whether Dr. Lumpkins, or any of the other five reviewing physicians has experience evaluating patients with fibromyalgia. Dr. Dixit's experience provides an additional reason why Dr. Dixit's opinion is entitled to more weight than those of the reviewing physicians. See Benecke, 379 F. 3d at 594 n. 4 ("Specialized knowledge may be particularly important with respect to a disease such as fibromyalgia that is poorly understood within much of the medical community.")

Accordingly, the Court finds plaintiff has met her burden of establishing she is disabled within the meaning of the LTD Plan.

//
//

---

[15] Dr. Lumpkins' reference to no "objective documentation" could be understood as a statement that plaintiff can work because no objective test confirms plaintiff's symptoms. As noted, however, "[o]bjective tests" cannot establish the "presence or absence of fibromyalgia." See Jordan, 370 F. 3d at 872. Indeed, defendants confirm that MetLife did not deny the claim on the ground plaintiff failed to offer "objective evidence that she suffered from fibromyalgia," (see Defs.' Mot. for Summ. J. at 14:19-21), and do not argue the Court should deny her claim on such ground.

13

**C. Entitlement to 7% Increase in Benefits**

Plaintiff argues that, in calculating the benefits to which she is due, plaintiff is entitled to an annual 7% increase in LTD benefits. In support of this argument, plaintiff cites the following provision contained in a prior version of the LTD Plan:

> The date on which your thirteenth monthly LTD benefit is payable, your covered pay will increase by 7%. Subsequent increases to your LTD benefits will take effect on each anniversary of the first increase, provided you have been continually receiving monthly LTD benefits under the LTD Plan.

(See AR at 199.)

Defendants argue the above-referenced section is inapplicable to plaintiff, because defendants, in July 2001, amended the plan to remove the above-quoted language. (See AR at 396.) In response, plaintiff argues that because defendant has not offered evidence to show plaintiff received notice of the amendment prior to August 18, 2001, the date of the onset of her disability, the amended plan does not apply to her. In essence, plaintiff seeks substantive relief, specifically, an award of benefits not available under the terms of the LTD Plan, based on defendants' asserted failure to provide timely notice of amendment.

Under ERISA, if a plan modification results in a "material reduction in covered services or benefits," the plan administrator must "furnish" plan participants with a "summary description of such modification" not later than 60 days after the date of the adoption of the modification. See 29 U.S.C. § 1024(b)(1)(B). Plaintiff cites no Ninth Circuit authority affording the relief plaintiff seeks for a failure to provide the requisite notice of amendment. Indeed, the Ninth Circuit has held that where the defendant fails to give timely notice of the cancellation of a plan, the plan participant is entitled to substantive relief only where the defendant "actively and deliberately misleads its employees to their detriment." See Peralta v. Hispanic Business, Inc., 419 F. 3d 1064, 1075-76 (9th Cir. 2005) (holding "[i]t is for Congress to provide a remedy when merely negligent administration results in the termination of coverage without timely notice"). Here, assuming plaintiff did not receive notice of the above-referenced July 2001 modification to the plan, plaintiff fails to offer any evidence that defendants' failure to provide such notice

was a deliberate act or otherwise was the product of bad faith, active concealment, or fraud.  See id.

Accordingly, plaintiff has failed to show she is entitled to an annual 7% increase in LTD benefits.

**D.  Amount of Benefits**

Plaintiff argues she is entitled to a monetary award in the amount of $193,578. Plaintiff fails to set forth the basis for her calculation, which calculation, in any event, appears to include the above-referenced 7% annual increase.  Defendants, for their part, do not address the amount of a monetary award, other than to object to the 7% annual increase.

In order to facilitate entry of final judgment, the parties will be directed to meet and confer and submit a proposed judgment setting forth the amount to which plaintiff is entitled under the terms of the LTD Plan.

**E.  Interest, Attorney's Fees and Costs**

In her motion, plaintiff requests an award of interest, attorney's fees, costs.

To the extent plaintiff seeks fees and costs, the request is premature because judgment has not been entered.  See Civil L.R. 54-1(a) (providing prevailing party may file bill of costs within 14 days of entry of judgment); Civil L.R. 54-6 (providing motion for award of attorney's fees shall be served and filed within 14 days of entry of judgment).  Further, in connection with a motion for fees, plaintiff may seek an award of prejudgment interest at a specific rate and in a specific amount.  See, e.g., Fleming v. Kemper Nat. Services, Inc., 373 F. Supp. 2d 1000, 1013 (N.D. Cal. 2005) (awarding, upon post-judgment motion, prejudgment interest at rate set by 28 U.S.C. § 1961 in specified amount).

Accordingly, the Court will defer ruling on the issues of attorney's fees, costs, and interest.

//
//
//

**CONCLUSION**

For the reasons stated above:

1. The parties' respective motions for summary judgment are hereby DENIED.

2. Pursuant to Rule 52, the Court finds:

   a. Plaintiff became disabled as of August 18, 2001, and, consequently, is entitled to disability benefits under the LTD Plan, beginning 22 weeks after August 18, 2001 (AR 196) and continuing until such time as plaintiff fails to meet the definition of "disabled" under the terms of the policy (AR 201); and

   b. Plaintiff is not entitled to an annual 7% increase in LTD benefits.

3. The parties are DIRECTED to meet and confer, no later than January 4, 2008, for the purpose of calculating the amount of benefits currently due plaintiff. The parties are further DIRECTED to jointly submit, no later than January 18, 2008, a proposed judgment, or, in the event they are unable to agree on the amount or form of judgment, to submit a joint statement setting forth therein each parties' proposed judgment and the reasons for any differences.

**IT IS SO ORDERED.**

Dated:  December 12, 2007

MAXINE M. CHESNEY
United States District Judge